Nathan Wohlfeld and Helen Wohlfeld v. Commissioner.
Wohlfeld v. Commissioner
Docket No. 59112.
United States Tax Court
T.C. Memo 1958-128; 1958 Tax Ct. Memo LEXIS 103; 17 T.C.M. (CCH) 677; T.C.M. (RIA) 58128; June 30, 1958
Sam G. Winstead, Esq., and Vester T. Hughes, Jr., Esq., for the petitioners. J. C. Linge, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1951 in the amount of $38,862.14. The issue to be decided is whether *104 a certain contract was completed in 1952 or 1953 for purposes of determining whether a net operating loss from the contract is applicable to 1951 as a net operating loss carryback. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Petitioners, husband and wife, are individuals living in Dallas, Texas. They filed joint income tax returns for the calendar years 1951 and 1952 with the then collector of internal revenue at Dallas, Texas. Nathan Wohlfeld, (hereinafter referred to as petitioner) had been in the construction business for many years as an individual. He used the cash basis of accounting and reported the income from long-term contracts on the completed contract method. On June 29, 1951, petitioner entered into Contract No. DA-41-243-eng-1048 with the United States Government, which contract called for the construction of eight 225-man barracks at Fort Hood, Texas, for a total contract price of $2,778,453. Other pertinent provisions of the contract are: "3. Changes and Extras. - The contracting officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications *105 of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the contractor for adjustment under this Clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of extra or change: Provided, however, That the contracting officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the contractor from proceeding with the prosecution of the work as changed. "4. Changed Conditions. - Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on *106 the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof. * * *
"7. Payments to Contractors. - (a) Unless otherwise provided in the specifications, progress payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, or at more frequent intervals as determined by the contracting officer, on estimates approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be *107 taken into consideration. "(b) In making such progress payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining progress payments in full: And provided further, That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full including retained percentages thereon, less auhorized [authorized] deductions. "(c) All material and work covered by progress payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract. "(d) Upon completion and acceptance of *108 all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein. If the contractor's claim to amounts payable under the contract has been assigned under the Assignment of Claims Act of 1940, 54 Stat. 1029 (41 U.S.C. sec. 15), a release may also be required of the assignee at the option of the contracting officer. * * *
"23. Assignment of Claims. - (a) Pursuant to the provisions of the Assignment of Claims Act of 1940 (31 U.S. Code 203, 41 U.S. Code 15), if this contract provides for payments aggregating $1,000 or more, claims for moneys due or to become due the contractor from the Government under this contract may be assigned to a bank, trust company, or other financing institution, *109 including any Federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any provision of this contract, payment to an assignee of any claim under this contract shall not be subject to reduction or set-off for any indebtedness of the contractor to the Government arising independently of this contract. (The preceding sentence applies only if this contract is with a military department.) "(b) In no event shall copies of this contract or of any plans, specifications, or other similar documents relating to work under this contract, if marked 'Top Secret', 'Secret', 'Confidential', or 'Restricted', be furnished to any assignee of any claim arising under this contract or to any other person not entitled to receive the same; provided that a copy of any part or all of this contract so marked may be furnished, or any information *110 contained therein may be disclosed, to such assignee upon the prior written authorization of the contracting officer. * * *
"ARTICLE 29. Termination for The Convenience of The Government. - (a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective." Pursuant to its right under the contract, the Government issued twenty-four changes in the original contract. The original contract and the subsequent changes were as follows: Revised Con-
Date
Item
Contract Work
Amount
tract Total
6-29-51
Contract
8 Barracks
$2,630,568.00
Water Lines
13,250.00
Sanitary Sewer System
6,500.00
Gas Distribution
4,000.00
Electrical Distribution
56,000.00
Excavation
23,069.00
Roads, Parking & Service
19,442.00
Storm Drains
9,850.00
Sidewalks
15,774.00
Original Total
$2,778,453.00
10- 9-51
Revision
Kitchen Equipment, Water Line and
Sewer
31,672.46
2,810,125.46
1-24-52
Order # 3
Plumbing, Electrical & Bldg. #8
Footing
31,334.57
2,841,460.03
2-17-52
Order # 2
Boiler Changes, Valves & Headers
64,464.51
2,905,924.54
2-18-52
Order # 4
Time Extension
2-18-52
Order # 5
Time Extension
4- 8-52
Order # 6
Excavation, Surfacing, Walks, Boiler
Bases
2,800.26
2,908,724.80
5-19-52
Order # 7
Plumbing
1,071.12
2,909,795.92
7- 3-52
Order # 8
Relocation of regulator
7- 5-52
Order # 9
Sewer Pipe
265.80
2,910,061.72
8-20-52
Order #10
Interior Revision
(12,027.07)
2,898,034.65
9-19-52
Order #11
Barracks Modification
(4,129.52)
2,893,905.13
10- 9-52
Order #12
Sewer & Storm Drains
4,443.13
2,898,348.26
11-10-52
Order #15
Deletion on Coffee Urns
(4,081.98)
2,894,266.28
11-12-52
Order #16
Refrigerator Connection
168.00
2,894,434.28
11-14-52
Order #17
Boiler Connections
700.24
2,895,134.52
12- 1-52
Order #13
Special Doors
39.20
2,895,173.72
12-15-52
Order #14
Electrical Equipment
3,759.92
2,898,933.64
12-15-52
Order #18
Electrical Distribution
3,704.13
2,902,637.77
12-15-52
Order #19
Excavation, Paving, Soil & Gravel
Overhaul
(19.01)
2,902,618.76
12-22-52
Order #20
Excavation
154.00
2,902,772.76
1-22-53
Order #21
Time Extension
1-26-53
Order #22
Underground Service Bldg
110.15
2,902,882.91
2- 3-53
Order #23
Sidewalk Steps
206.06
2,903,088.97
4- 1-53
Order #24
Time Extension
5- 6-53
Voucher
Reduced Quantity
(1,111.40)
2,901,977.57
6- 5-53
Formal Ac-
ceptance
Final Total
$2,901,977.57
*111 The primary subject matter of the contract, the eight 225-man barracks, were accepted for beneficial occupancy and petitioner was relieved of responsibility for maintenance and protection thereof on the following dates: Barracks
Dates of Acceptance
#1
September 26, 1952
#2
October 31, 1952
#3
October 17, 1952
#4
October 21, 1952
#5
November 7, 1952
#6
December 31, 1952
#7
December 31, 1952
#8
December 2, 1952
On December 19, 1952, Col. H. R. Hallock, the district engineer, filed an inspection report with the Government Project Engineer which estimated completion of the contract as follows: Contract
Per Cent
Item
Amount
Complete
Barracks:
#1
$336,579.92
99.5
#2
336,579.92
99.5
#3
336,579.92
99.5
#4
336,579.92
99.5
#5
336,579.92
99.5
#6
336,579.92
98.0
#7
336,579.92
98.0
#8
336,579.92
99.5
Water Lines
16,653.21
99.5
Sanitary Sewers
6,829.60
99.5
Gas Distribution
4,000.00
99.5
Electrical Distribution
56,000.00
99.5
Excavation & Embank-
ment
22,669.00
45.0
Roads, Parking Area &
Culverts
19,442.00
50.0
Storm Drains
9,850.00
90.0
S. W. Sidewalks
15,774.00
80.0
720 Sq. Ft. Additional
Sidewalk
360.00
Furnish GFM
28,077.60
98.0
8inch Cast Iron Pipe
265.00
100.0
*112 The report further stated: "Heavy rains during past 30 days has delayed progress on storm drain, outside utilities and site grading." On December 19, 1952, the Wohlfeld Construction Company was incorporated under the laws of the State of Texas, with a capitalization of $50,000. The stock, of which petitioner owned all but the qualifying shares, was purchased with $45,000 in construction equipment and $5,000 cash. The corporation was formed for the purpose of transferring to it the construction business of petitioner, and it was intended that the new corporation would continue to operate the previous business. Petitioner also sought the corporate form as a means of compensating the employees who had remained with him in the construction business for many years. On December 31, 1952, petitioner executed an assignment of Contract No. DA-41-243-eng-1048 to the Wohlfeld Construction Company for a $35,000 note payable and the assumption by the company of $171,126.97 of liabilities incurred by Nathan Wohlfeld but not paid by him for work on the contract. Pursuant to a request from petitioner, the government project engineer forwarded to petitioner on January 8, 1953, a statement of *113 estimated "earnings" on the contract for work at Fort Hood as of December 31, 1952. This report is summarized as follows: Revised Contract
Amount Earned
Item
Amount
12-31-52
1. 8 Barracks
$2,720,390.40
$2,706,788.45
2. Water Lines
16,653.21
16,569.94
3. Sanitary Sewer System
6,829.60
6,795.45
4. Gas Distribution
4,000.00
4,000.00
5. Electrical Distribution
57,472.00
57,184.64
6. Excavation & Embankment
22,969.00
11,484.50
7. Roads, Parking & Service
19,744.08
9,872.04
8. Storm Drains
9,850.00
8,865.00
9. Sidewalks
15,774.00
14,115.72
10. Installation of Kitchen Equipment
28,077.60
28,077.60
11. Additional Footing, Bldg. 8
2,408.57
2,408.57
12. Additional Sidewalk
355.50
355.50
13. Revised Window Sills
682.72
682.72
14. Revised Boiler Bases
1,155.46
1,155.46
15. 8inch Cast Iron Sewer Pipe
265.80
265.80
16. Revision, Interior Electrical Work
(12,027.07)
(12,027.07)
17. Cup Warmers
(4,081.98)
(4,081.98)
18. Refrigerator Connections
168.00
168.00
This report stated the total contract price, as of December 31, 1952, to be $2,890,691.39. The same report also estimated the percentage of overall completion as *114 98.65, and estimated total "earnings" under the contract as $2,851,680.34, both as of December 31, 1952. Of this latter amount, the Government retained $183,980.52 as the usual 5.145 per cent withheld until formal acceptance. The Wohlfeld Construction Company continued to perform the contract, with Nathan Wohlfeld as the individual in charge for the company, although his status had changed from sole proprietor to shareholder. The Wohlfeld Construction Company recorded expenditures with respect to the contract as follows: Liabilities incurred by Wohlfeld
on contract and assumed by
company on the transfer
$171,556.51
Additional expenditures by com-
pany subsequent to transfer
17,006.98
Paid to petitioner Wohlfeld for
transfer of contract
35,000.00
Total cost of contract to com-
pany
$223,563.49
The total expenditures to complete the contract, by petitioner and the company, amounted to $3,065,339.93, of which $17,006.98 were paid by the Wohlfeld Construction Company in connection with the completion of the contract subsequent to the assignment on December 31, 1952. While some of the communications with the Government subsequent to the assignment were signed *115 by petitioner as president, the Government required that these be re-executed by him in his individual capacity. The Government issued final acceptance of the contract on June 5, 1953. Final payment was then made to petitioner by the Government. Subsequently, the Wohlfeld Construction Company continued in the construction business with petitioner as its president and manager. The contract to build eight barracks at Fort Hood, Texas, was complete on December 31, 1952, for purposes of reporting the gain or loss realized by the petitioners from the contract. As of that date, there was a loss of $174,066.62 to petitioners under the contract. Petitioners included the net loss from the Fort Hood contract in their 1952 tax return. A net operating loss from the construction business due to this contract in the amount of $174,066.62 was asserted as a carry-back adjustment to the taxable year 1951 and was the basis for a refund granted in the tax liability for that year. Respondent later determined that the Fort Hood contract was not completed on December 31, 1952, and that the net loss from the contract was not allowable as a net operating loss carry-back to 1951, since the applicable statute *116 allowed only a one-year carry-back. Opinion Petitioners contend that the contract was complete for the purpose of reporting gain or loss realized therefrom and we have so found. Respondent determined that the contract was not complete, as required by the applicable section of the Internal Revenue Code of 1939 and the regulations thereunder. [1] He concedes that the contract was at least 98.26 per cent complete, but argues that the regulations require absolute and final completion and formal acceptance by the other contracting party, with nothing remaining to be accomplished. This position, however, has been refuted previously in Ehret-Day, 2 T.C. 25 (1943). In that case, the taxpayer, who reported income on the completed contract basis, had performed all essential particulars of the contract, but was required to replace some flooring and finish a few other details of the contract, before the other contracting party would give his final acceptance and make final payment under the contract. The respondent argued there that substantial performance was sufficient under his regulations. In upholding this determination of the respondent, this court stated, 2 T.C. 25, at 34:
*117 * * * "If the contractor has substantially performed his contract, even though he has failed to do so in some minor particulars, he is entitled to recover the contract price, less what will be a fair allowance to the owner to make good the defects in the performance of the contract. "The facts in the present case clearly show that during the year 1938 the petitioner was, under the above rule of law, entitled to recover the unpaid portion of the contract price of the Fredericks building, subject to such allowance or set-off as might be shown to be proper for the repair of the minor defects complained of. There is nothing in the record showing, or tending to show, that the defects involved were occasioned by lack of good faith or lack of intention or attempt to perform its contract by petitioner so as to preclude application of the quoted rule. In our opinion, the regulations do not contemplate that a building contract which has been completed in all important particulars, except for minor defects, as was the Fredericks contract, shall be regarded as being uncompleted until such time as the *118 minor defects may actually be corrected or adjustment made therefor. We hold that the Fredericks contract was finally completed in 1938 within the meaning of article 42-4(b) of Regulations 101." Respondent argues that the instant contract was not performed in all of its important particulars, relying on the report of the project engineer which estimated the earnings under the contract as of December 31, 1952, to have been only $2,851,680.34 while the same report estimated the total contract amount to have been $2,890,691.39. A careful examination of this report, however, discloses it to be inaccurate in certain respects. For example, the report stated that some $14,000 remained to be earned with respect to the eight barracks proper as of December 31, 1952, whereas, in fact, all eight barracks had been accepted by the Government and the petitioner had been relieved of liability for maintenance thereof on that date. The same project engineer's report of December 31, 1952, states the amount of the full contract price to be $2,890,691.39 when, in fact, the actual amount, as adjusted by the change orders effective *119 on that date, was $2,902,772.76. However, aside from these apparent inconsistencies, we do not believe that the issue presented here need be controlled by minute computations of the state of completion of the contract in terms of the dollars earned under it. The fact is that, under any set of computations, a relatively insignificant amount of work remained to be done. The Government had accepted all barracks for beneficial occupancy and relieved petitioner from maintenance thereof by December 31, 1952, and it seems reasonable to conclude from this fact that no work remained to be done on the interior of the buildings, or on the exterior, which would interrupt full use of the buildings. The remaining outside work, not necessary to occupancy of the barracks, consisted of certain sidewalks, paving, and excavating, concerning which the project engineer estimated a total of $23,014.82 still to be "earned" as of December 31, 1952. This latter amount is but 0.71 per cent of the contract total. In any event, the delay in finishing the work was not due to any lack of good faith on the part of petitioner but was due to the weather, a factor which he could not control. The contract was complete *120 in all of its important particulars on December 31, 1952, and the barracks were accepted for beneficial occupancy by the Government on that date. The loss from the Fort Hood contract was correctly reported in 1952, Ehret-Day, supra, and is a net operating loss carry-back to 1951. Sec. 122(b), 1939 Code, as amended 1950 Rev. Act, sec. 215. The petitioner has also asserted that the assignment of the contract on December 31, 1952, supports the recognition of loss in that year. However, because of our determination that the contract was in fact complete on December 31, 1952, it is unnecessary to decide the effect of the assignment of the contract to the Wohlfeld Construction Company. Decision will be entered for petitioners. Footnotes
1. Sec. 42(a), 1939 Code, and Regulations 103, sec. 19.42-4(a).↩